UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAPHNE GUNTER, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *   Civil Action No. 1:19-cv-12502-IT |
| | * |
| SHAPLEY & STERN, INC., | * |
| | * |
| Defendant. | * |

MEMORANDUM & ORDER

April 30, 2021

TALWANI, D.J.

Plaintiff Daphne Gunter, a former account manager with Defendant Shapley & Stern, Inc., brought this action alleging that her former coworker, James Patterson, sexually harassed her, that she reported his behavior to Shapley & Stern's human resources office, and that Shapley & Stern subsequently terminated her. Am. Compl. ¶¶ 7-10, 16 [#25]. She asserts six claims against Shapley & Stern: sexual harassment (Count I), discrimination and harassment based on sex or gender (Count II), and retaliation (Count III) in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000 *et seq*., and the same in violation of the Massachusetts anti-discrimination statute, Mass. Gen. Laws ch. 151B ("chapter 151B") (Counts IV-VI).[1] Now pending before the court is Shapley & Stern's Motion for Summary Judgment [#40]. For the following reasons, the motion is GRANTED in part and DENIED in part.

---

[1] The Amended Complaint [#25] also alleged sexual harassment (Count VII) and retaliation (Count VIII) in violation of ch. 151B against Patterson. However, Patterson was not served and has been dismissed from this action. See Elec. Order [#43].

I.     **Standard of Review**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 331.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 314. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

II.   **Factual Background**

Viewing the evidence in the light most favorable to Gunter and drawing all reasonable inferences in her favor, the facts are as follows.

Shapley & Stern is a private company that sells furniture and carpeting to interior designers. Plaintiff's Response to Defendant's Statement of Undisputed Material Facts ("Pl.'s SOF Resp.") ¶ 1 [#46-1]. At the time of the events at issue, it employed approximately twenty-five people, many of whom worked remotely. Id. at ¶ 5. In July 2018, Gunter was hired by Shapley & Stern to work remotely from her home in Boston as an account manager covering the New England territory Id. at ¶ 6. She was supervised by Hayley Stern. Id. at ¶ 9.

During her first week of employment, Gunter attended orientation and training in New York, NY. Id. at ¶ 18. Patterson, who lived in Arizona, was also in New York to interview for a sales position with Shapley & Stern. Id. at ¶¶ 19-20. Before returning to Boston, Gunter had lunch with Shapley & Stern's CEO Jamie Stern, Hayley Stern, Patterson, and two other employees. Id. at ¶¶ 2, 22. During the lunch, Patterson, who was sitting next to Gunter, touched Gunter's leg under the table five times. Id. at ¶ 27. Gunter did not say anything at the time but left the lunch early due to her discomfort. Id. at ¶ 28.

On August 3, 2018, Shapley & Stern held a sales meeting via videoconference, during which Gunter sat on the couch in her living room Id. at ¶ 32. After the meeting, Gunter received an email from Patterson, who had just been hired as a sales representative, stating "You look comfortable on the couch [smiley face]." Id. at ¶¶ 20, 33. Gunter initially thought that the email was from Jamie Stern. 8/3/2018 Email Exchange [#42-7]. However, upon realizing that it was from Patterson, she responded and exchanged several emails with him to be professional, despite her discomfort with the interaction. Id.; Pl.'s SOF Resp. ¶¶ 35-36 [#46-1]. At the end of the exchange, Patterson asked for Gunter's cell phone number so that they could "keep in touch." 8/3/2018 Email Exchange [#42-7].

On August 6, 2018, Gunter forwarded the email exchange to Hayley Stern. Pl.'s SOF Resp. ¶ 39 [#46-1]. Hayley Stern thanked Gunter for bringing the issue to her attention and said that she would let Gloria Solecitto, who ran human resources, know what had happened. Id. at ¶¶ 3, 40; 8/3/2018 Email Exchange [#42-7]. The email was forwarded to Solecitto, who contacted Gunter the next day. Pl.'s SOF Resp. ¶¶ 41-42 [#46-1].

In her conversation with Solecitto, Gunter mentioned that Patterson had touched her inappropriately at their lunch in July. Id. at ¶ 43. Solecitto asked if Gunter wanted to file a formal complaint against Patterson, and Gunter said that she did not. Id. at ¶ 44; Am. Compl. ¶ 10. Afterwards, Solecitto reviewed Patterson's emails and learned that he had written several similar introductory emails to other sales representatives. Pl.'s SOF Resp. ¶ 45 [#46-1]. Solecitto did not speak with Patterson about Gunter's allegations of inappropriate sexual touching. Id. at ¶ 46 [#46-1]. Patterson was never given a verbal or written warning about his behavior. Id. at ¶ 92.

Throughout her employment with Shapley & Stern, Gunter experienced technical difficulties with her company-issued iPad, which she used to access the company "portal," a

4

sales tool that included price lists, marketing materials, and other important information for sales representatives. Id. at ¶¶ 100-01. As a result of these issues, Gunter had trouble performing some of her job functions. Id. at ¶ 101. Hayley Stern was aware of the problem and told Gunter to contact Apple to try to resolve them. Id. Although Apple customer service helped Gunter on two occasions, the problem was never resolved, and Gunter continued to have difficulty logging into and accessing the company portal during the entire period of her employment. Id.

Beginning in late August 2018, Hayley Stern began emailing Gunter with concerns about her performance. On August 30, 2018, Hayley Stern wrote to Gunter asking her why she had not followed up with a designer and emphasizing that "Timing is HUGE." 8/14/2018 & 8/30/2018 Emails [#42-9]. Later that day, she emailed again, asking Gunter whether she had been able to access the portal yet and stating that the several-day delays in responding to customers was "really unacceptable" and could "really cause us to loose [sic] the order." 8/30/2018 Email [#42-10]. On October 1, 2018, Hayley Stern sent Gunter another email highlighting similar problems. 10/1/2018 Email [#42-11]. She noted that Gunter had "neglected" some of the big accounts in Boston and said that it was "vital" that Gunther follow up and "not let too much time go by before speaking with the designers." Id.

On October 30, 2018, Jamie Stern emailed Gunter with some "serious notes" about her end-of-the-month review. 10/30/2018 Email [#42-12]. The email stated that Gunter was not meeting her scheduling goals and that the company needed to see "much more activity, like quotes, sample requests, and designer requests" from Gunter's accounts. Id. Jamie Stern then cautioned that Gunter "should be aware that these [requirements] are absolutes for being successful in sales and an incomplete schedule, or lack of quality product presentations or penetration of key accounts will completely prevent you and us from achieving our goals." Id. A

5

month later, Hayley sent Gunter another email stating that she was "concerned about the level of sales" in Gunter's territory and again "highlight[ing] the importance of urgency and follow-up with projects and customer requests." 11/27/2018 Email [#42-13].

On January 2, 2019, Gunter learned that the company had planned an in-person training for some of the sales representatives. Pl.'s SOF Resp. ¶ 58 [#46-1]. Upon learning that Patterson would be there, Gunter told Zach Mufson, who had some supervisory role over the sales representatives, that she had concerns about attending the training. Id. at ¶¶ 59-60. Gunter did not speak with anyone else at Shapley & Stern about her concerns. Id. at ¶ 62.

On January 7, 2019, Jamie Stern called Gunter and informed her that she was being terminated because of her low sales. Id. at ¶ 64. Carol Reisner was hired to replace Gunter but was later discharged for poor performance. Id. at ¶ 72. Patterson was also eventually terminated for poor sales. Id. at ¶ 73.

### III.    Discussion

Gunter brings claims against Shapley & Stern for sexual harassment, gender discrimination, and retaliation. The court considers each category in turn.

    A.    *Sexual Harassment*

In her first set of claims, Gunter alleges that she was subjected to sexual harassment in violation of Title VII and chapter 151B. Title VII prohibits discrimination by an employer against an employee based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination based on sex includes sexual harassment, which comes in two forms: (1) "quid pro quo" harassment, which occurs when sexual advances are made an explicit or implicit condition of an employment decision, and (2) "hostile work environment" harassment, which occurs when an employee is subjected to unwanted sexual comments, advances, requests, or

other similar conduct. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986). Chapter 151B contains similar prohibitions on employer sexual harassment. See Ramsdell v. Western Mass. Bus Lines, Inc., 415 Mass. 673, 676-77, 615 N.E.2d 192 (1993).

Both statutes share the same basic framework for assessing whether a plaintiff has been subjected to a hostile work environment.[2] See Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005) (Title VII); Muzzy v. Cahillane Motors, Inc., 434 Mass. 409, 411, 749 N.E.2d 691 (2001) (chapter 151B). First, a plaintiff must demonstrate that "she was subjected to severe or pervasive harassment that materially altered the conditions of her employment." Noviello, 398 F.3d at 92 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998)). Second, the harassment must be "objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive," and, third, the plaintiff must in fact perceive it to be so. O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001).

A hostile work environment is one "permeated with discriminatory intimidation, ridicule, and insult." Harris v. Forklift Sys. Inc., 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). "Most hostile work environments are bred from an ongoing series of harassing incidents." Noviello, 398 F.3d at 84. There is no "mathematically precise test" at which point a work environment becomes hostile. Harris, 510 U.S. at 23. Rather, a court must consider the totality of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." Pomales v. Celulares

---

[2] The statutes do have some differences, but these relate primarily to employer liability. See Noviello, 398 F.3d at 95.

Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006). Given the fact-intensive nature of this inquiry, it is often reserved for a fact finder. Id. However, "summary judgment is an appropriate vehicle for 'polic[ing] the baseline for hostile environment claims.'" Id. (quoting Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc)) (internal citations omitted).

"[B]ehavior like fondling, come-ons, and lewd remarks is often the stuff of hostile work environment claims." Billings v. Town of Grafton, 515 F.3d 39, 48 (1st Cir. 2008) (gathering cases). That is precisely the type of conduct alleged here. Gunter claims that, during a business lunch in her first week of employment, Patterson "touched and squeezed her upper, inner thigh up her skirt under the table," that he "squeezed for approximately five seconds and continued to rest his hand on her thigh" before removing it, and that he repeated this behavior several times. Pl.'s SOF Resp. ¶ 82 [#46-1]. Less than a month later, following a virtual sales meeting, Patterson sent Gunter an email containing comments that made her feel uncomfortable given their first interaction and asked for her phone number. Id. at ¶ 84.

But although the claimed conduct may be "the stuff of hostile work environment claims," in light of the limited interactions between Gunter and Patterson, Patterson's behavior is not enough for a hostile work environment claim; Gunter must also demonstrate that his actions "materially altered the conditions of her employment." Noviello, 398 F.3d at 92. That she has failed to do. Shapley & Stern emphasizes that Gunter worked remotely from her home in Boston, while Patterson was based in Arizona; they were together in person only once; and their only other interaction was the email exchange following the video conference. Def.'s Mem. 12-13 [#41]. Gunter counters that she and Patterson also both attended sales calls. Pl.'s SOF Resp. ¶ 38 [#46-1]. But Gunter provides no evidence whatsoever of how these virtual interactions, in the presence of others, altered the conditions of her employment or affected her job performance.

This omission is all the more notable given the level of detail with which Gunter explains how her challenges with the company-issued iPad impacted her ability to do her work. Id. at ¶¶ 100-101. Where Gunter has not demonstrated any way in which Patterson's alleged conduct impacted her job, the court concludes that no reasonable fact finder could find that his behavior "materially altered" Gunter's work conditions within the meaning of Title VII or chapter 151B. Summary judgment is therefore appropriate.

B.   *Gender Discrimination*

Gunter's second set of claims alleges that she was discriminated against based on her gender in violation of Title VII and chapter 151B.[3] On a motion for summary judgment where, as here, there is no direct evidence of discriminatory intent, courts analyze the issue of gender discrimination through the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ("McDonnell Douglas"). See Lockridge v. Univ. of Maine Sys., 597 F.3d 464, 470 (1st Cir. 2010) (Title VII); Wheelock Coll. v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130, 137, 355 N.E.2d 309 (1976) (chapter 151B). First, the plaintiff must establish a prima facie case of discrimination. See McDonnell Douglas, 411 U.S. at 802. Second, if the plaintiff meets this burden, a presumption of discrimination arises, and the burden shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action. See id. Third, if the defendant meets its burden, the presumption dissolves, and the burden shifts back to the plaintiff to prove that the

---

[3] At the summary judgment hearing, the court and Gunter's counsel treated Gunter's gender discrimination claim as based on, and co-extensive with, the sexual harassment claim. As such, the claim is addressed in the prior section. In this section, the court addresses Gunter's claim to the extent that it can be understood to allege that her termination was based on gender discrimination.

9

defendant's proffered non-discriminatory reason is a pretext for unlawful discrimination. See id. at 804-05.

A plaintiff's burden of establishing a prima facie case of discrimination is "relatively light." Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981). However, Gunter has not met it. Where the discrimination alleged is gender discrimination, the prima facie case requires the plaintiff to show that (1) she is a member of a protected class, (2) she met her employer's expectations, (3) her employer took an adverse action against her, and (4) her employer sought a replacement with similar qualifications or other similarly situated to her in all relevant respects were treated differently by the employer. See Ray v. Ropes & Gray LLP, 799 F.3d 99, 113 (1st Cir. 2015); Beal v. Bd. of Selectmen of Hingham, 419 Mass. 535, 544, 646 N.E.2d 131 (1995). Gunter is a member of a protected class, and her termination is an adverse action. But Gunter has not demonstrated that she was performing her job at an acceptable level. Nor has she shown that she was treated differently from male employees—in fact, Patterson was also terminated for poor sales—and Gunter's replacement was a woman. Gunter has therefore not made out a prima facie case of gender discrimination.

C.   *Retaliation*

Gunter's final claims allege retaliation for making a report to human resources. Both Title VII and chapter 151B contain provisions that make it unlawful for employers to retaliate against employees who complain about allegedly discriminatory employment practices. See 42 U.S.C. § 2000e-3(a); Mass. Gen. Laws ch. 151B, § 4(4). Under either statute, a plaintiff must show that (1) she engaged in protected conduct, (2) she suffered an adverse employment action, and (3) the two were causally linked. See Noviello, 398 F.3d at 88. But what counts as an "adverse employment action" for a retaliation claim is broader than for one based on discrimination.

In the retaliation context, the court's concern is to ensure that employers do not act in such a way as to dissuade employees from filing complaints. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). Accordingly, an "adverse employment action" for purposes of a retaliation claim is one where "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).[4] As with discrimination claims, where there is no direct evidence of the defendant's retaliatory motive, courts employ the McDonnell Douglas framework. See Lockridge, 597 F.3d at 472.

Gunter claims that, after she complained about Patterson's conduct to Solecitto, the following things happened. Hayley and Jamie Stern began interacting with her less frequently, and she had no interactions with Hayley Stern in October or November 2018. Pl.'s Mem. 4-5 [#46]. The Sterns did not respond to her questions about product pricing, delayed sending her a list of client leads, and excluded her from a regional event where she would have met potential clients. Id. at 5, 7. Management also stopped trying to help her resolve her iPad issues, which had been going on since the beginning of her employment, even though she needed the iPad to access

---

[4] The Massachusetts courts have not decided whether a different standard for adverse employment actions applies to retaliation claims. See Yee v. Massachusetts State Police, 481 Mass. 290, 299 n.8, 121 N.E.3d 155 (2019) ("we need not reach the question whether to apply a different standard to defining adverse employment actions in the retaliation context under [chapter 151B]"). But in considering the Supreme Judicial Court's practice of "look[ing] to federal court interpretations of Title VII for guidance" in interpreting chapter 151B, the First Circuit has previously concluded that the Supreme Judicial Court "would quite likely interpret the anti-retaliation provision of chapter 151B exactly as we have interpreted the counterpart provision of Title VII." Noviello, 398 F.3d at 91. Absent any protest from the Massachusetts courts, this court therefore proceeds as though the standard for materially adverse employment actions articulated in Burlington Northern for retaliation claims under Title VII applies equally to those brought under chapter 151B.

information critical to her job. Id. at 5-7. Then, three days after expressing her concerns to Mufson about the in-person training at which Patterson would be in attendance, she was terminated, supposedly for meeting a sales target that nobody had ever told her about. Id. at 8, 19. In short, her argument is that Shapley & Stern set her up to fail and, when she inevitably did, they fired her.

Shapley & Stern does not dispute that Gunter engaged in a protected activity by reporting Patterson's alleged behavior to human resources, and the court concludes the alleged retaliatory actions, taken as a chain of events that culminated in Gunter's termination, rise to the level of a "materially adverse" employment action for purposes of her retaliation claims. The only remaining issue is whether the two were causally linked.

Gunter claims that Shapley & Stern took no real steps to investigate her complaint or discipline Patterson and that, instead, the shift in the Sterns' interactions with her began shortly after she made her initial complaint. Id. at 4. In addition, she states that she was terminated only three days after expressing her concerns to Mufson about the in-person training at which Patterson would be in attendance. Id. at 19. "Establishing a prima facie case isn't usually a tough sell." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 88 (1st Cir. 2018) (citing Koseireis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2013). And "temporal proximity alone can suffice to 'meet the relatively light burden of establishing a prima facie case of retaliation.'" DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008) (quoting Mariani–Colon v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 224 (1st Cir. 2007)). The court therefore concludes that Gunter has met her burden under step one of the McDonnell Douglas framework.

At step two, Shapley & Stern must offer evidence of a nondiscriminatory reason for its conduct, up to and including her termination. As discussed previously, Shapley & Stern has

identified several emails showing that Hayley and Jamie Stern were concerned about Gunter's performance at work, including her failure to follow up with accounts and her "incomplete schedule," and that her failure to rectify these problems ultimately led to her termination. They also deny that the Sterns' interactions with Gunter dried up after August 2018, pointing to Hayley Stern's visit to Boston in late September to provide Gunter with job coaching and multiple emails during that time in which Hayley Stern encouraged Gunter to be in touch so that Hayley Stern could "be of assistance and help facilitate when necessary." Def.'s Reply 4 [#47]; 10/30/2018 Email [#42-12]; 11/27/2018 Email [#42-13]. And they claim that Gunter's iPad issues were not as dire as she claims because she could have accessed the company materials using her personal computer but opted not to. Id. at 5. Shapley & Stern has met its burden at this stage by offering evidence that it was Gunter's failure to be effective in her job, not her complaint about Patterson, that led to her termination. Id. The burden is therefore back on Gunter to show that this reason is pretextual and that she was, instead, terminated for reporting Patterson's behavior. See McDonnell Douglas, 411 U.S. at 804-05.

At step three, Gunter argues that Shapley & Stern established "arbitrary expectations" for her performance *after* her termination and that she "did not receive any warnings about her performance." Pl.'s Opp. 20 [#46]. The record supports the facts that she was never given a specific sales target during her employment and that she was never given a formal warning, but she was told multiple times over several months that she was not meeting the company's objectives. That does not resolve the issue, though, of whether Gunter's performance problems were the *result* of Shapley & Stern's allegedly retaliatory actions in not providing her with the support that she needed to meet expectations. Shapley & Stern's failure to question Patterson about Gunter's allegations lends some support to her claim of animus against her for making a

13

complaint. The timing of her termination also raises questions. Shapley & Stern claims that Jamie Stern decided to terminate Gunter after the holidays in December 2018 due to her low sales. Def.'s Mem. 6 [#41]. But despite this decision, on January 2, 2019, Shapley & Stern scheduled Gunter to attend an in-person training on January 10 and 11, 2019. Id. She was then fired on January 7, 2019, shortly after complaining about the fact that Patterson would be present at the training. Pl.'s Mem. 20 [#46]. A reasonable jury could plausibly make a series of permissible inferences and find that, due to Gunter's complaint about Patterson, Shapley & Stern set her up to fail and then terminated her. The court acknowledges that the evidence is slight, but it is nonetheless sufficient to leave the question of pretext to a jury. See Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). Summary judgment is therefore inappropriate as to Gunter's retaliation claims.

### IV.     Conclusion

For the foregoing reasons, Shapley & Stern's Motion for Summary Judgment [#40] is GRANTED as to Counts I, II, IV, and V, and DENIED as to Counts III and VI.

IT IS SO ORDERED.

April 30, 2021                                          /s/ Indira Talwani
                                                        United States District Judge